J-S12015-16

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| IN THE INTEREST OF: P.J.W.P., A MINOR | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: T.D.W.-J., MOTHER | No. 1421 EDA 2015 |

Appeal from the Decree April 14, 2015
In the Court of Common Pleas of Philadelphia County
Family Court at No(s): CP-51-AP-0000176-2015
CP-51-DP-0002203-2012

| | |
|---|---|
| IN THE INTEREST OF: J.T.Q.-W., A MINOR | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: T.D.W.-J., MOTHER | No. 1429 EDA 2015 |

Appeal from the Decree April 14, 2015
In the Court of Common Pleas of Philadelphia County
Family Court at No(s): CP-51-AP-0000177-2015
CP-51-DP-0002204-2012

BEFORE: MUNDY, J., OLSON, J., and STRASSBURGER, J.[*]

MEMORANDUM BY MUNDY, J.: **FILED MARCH 15, 2016**

---

[*] Retired Senior Judge assigned to the Superior Court.

Appellant, T.D.W.-J. (Mother), appeals from the April 14, 2015 decrees involuntarily terminating her parental rights to her minor daughter, P.J.W.P., born in May 2012, and to her minor son, J.T.Q.-W., born in December 2009 (collectively, the Children).[1]  Mother's notices of appeal also purportedly challenge the orders changing the Children's permanency goals to adoption. After careful review, we affirm.

The trial court summarized the factual and procedural history of this matter as follows.

> On December 20, 2009, [the Philadelphia Department of Human Services (DHS)] received a General Protective Services (GPS) report alleging that [Mother] and child [J.T.Q.-W.] had tested positive for marijuana at [J.T.Q.-W.'s] birth at Temple University Hospital (TUH).  [M]other had admitted to smoking marijuana during her pregnancy.  Furthermore, [M]other declined to accept Child Abuse and Prevention and Treatment Act (CAPTA) services.  The report was substantiated by DHS.
>
> DHS provided In-Home Protective Services (IHPS) for the family through Tabor Children's Services from January 13, 2010 until February 24, 2010.
>
> On May 17, 2012, DHS received a second GPS report alleging that [M]other tested positive for marijuana at [P.J.W.P.'s] birth at [TUH].  The child, [P.J.W.P.], had not yet been tested.  [M]other admitted to using marijuana during this pregnancy.  Moreover,

---

[1] The trial court also entered separate decrees terminating the parental rights of P.J.W.P.'s father, T.Q., and terminating the parental rights of the unknown father of J.T.Q.-W.  Neither T.Q. nor J.T.Q.-W.'s father are parties to the instant appeal.

[M]other was referred to CAPTA, however, she declined services. The report was substantiated. DHS subsequently implemented IHPS in the family's home through Tabor.

On July 1, 2012, DHS and IHPS visited the family's home. A [s]afety plan was developed which stated that [M]other was to enroll in [a] drug treatment program, ensure that the [C]hildren attended all medical appointments[,] and she was to enroll in parenting classes. [M]other declined the treatment program offered by DHS stating she would find her own program.

On August 2, 2012, DHS learned that [M]other had moved to a new location which DHS deemed inappropriate for the [C]hildren. DHS transported the family to the home of a family friend. On or about August 31, 2012[,] the family friend evicted the family because [M]other was absent from the home during the night. Furthermore, [M]other was allowing strangers into the home and was being disrespectful to the family friend.

On September 4, 2012, DHS learned that [M]other was not receiving drug treatment and had missed two parenting classes. [M]other and her children were residing with the paternal grandmother, Ms. [P.]

On October 16, 2012, a counselor at The Wedge Medical Center, a treatment facility, informed DHS that [M]other had attended an intake appointment on October 9, 2012. Subsequently, [M]other never returned to the facility for treatment.

On November 16, 2012, DHS visited the family and Ms. [P.] at Ms. [P.'s] home. Ms. [P.] stated that she had evicted [M]other on November 10, 2012. Ms. [P.] kept [P.J.W.P.] and [M]other took [J.T.Q.-W.] with her to an unknown location. [M]other agreed to enter the shelter system.

On November 16, 2012, [M]other and [J.T.Q.-W.] were accepted into a shelter. Subsequently, [M]other was evicted from the shelter due to her poor attitude and behavior. [M]other returned to Ms. [P.'s] home.

On December 10, 2012, DHS filed a dependency petition on behalf of [P.J.W.P.] and [J.T.Q.-W.].

On February 12, 2013, an adjudicatory hearing was held before the Honorable Jonathan Q. Irvine. Judge Irvine adjudicated the [C]hildren, [P.J.W.P.] and [J.T.Q.-W.,] dependent and ordered DHS supervision in the home. The [C]hildren remained in the care of [M]other.

On May 20, 2013, DHS held a Family Service Plan (FSP) meeting. The parental objectives for [M]other included: 1) ensure that all the needs of the [C]hildren were being met, 2) obtain appropriate housing, and 3) complete drug and alcohol treatment. [M]other did not participate in the meeting.

On July 10, 2013, a permanency review hearing was held before the Honorable Jonathan Q. Irvine. Judge Irvine discharged DHS supervision and committed the [C]hildren to DHS. The [c]ourt found [M]other had not been cooperative with DHS and IHPS. [M]other missed a total of ten early intervention evaluations. The [trial c]ourt ordered that the [C]hildren [] be placed in the care and custody of DHS. Furthermore, the [trial c]ourt issued a stay away order against [M]other on behalf of paternal grandmother, Ms. [P.].

On July 10, 2013, [P.J.W.P.] was placed with her paternal grandmother. The sibling, [J.T.Q.-W.], was placed in foster care through the Bethanna Agency.

On July 15, 2013, DHS referred [M]other to the Achieving Reunification Center (ARC) program for adult education, mental health treatment, anger

management, housing, employment, substance abuse treatment[,] and job training.

On September 12, 2013, [M]other was arrested for felony [c]riminal [t]respass, simple assault[,] and related charges[.]

On October 9, 2013, at a permanency review hearing before Judge Irvine, it was reported that [M]other was incarcerated at the Riverside Correctional Facility. She remained incarcerated until July, 2014[,] at which time she pled guilty to the charges from September 12, 2013. [M]other was sentenced to eleven and one[-]half to twenty[-]three months incarceration with immediate parole and three consecutive years reporting probation.

On July 7, 2014, a [FSP] meeting was held. [M]other's FSP objectives were: 1) maintain visitation and contact with the [C]hildren, 2) to meet regularly with the agency social worker and to follow through with Individual Service Plan (ISP) objectives.

The matter was listed on a regular basis before judges of the Philadelphia Court of Common Pleas – Family Court Division – Juvenile Branch pursuant to section 6351 of the Juvenile Act, 42 Pa.C.S.A. §6351, and evaluated for the purpose of determining or reviewing the permanency plan of the [Children].

In subsequent hearings, the [Permanency Review Orders] reflect the [trial c]ourt's review and disposition as a result of evidence presented addressing and primarily with the goal of finalizing the permanency plan.

On February 23, 2015, [M]other was found to be in violation of her parole and was sentenced to three to twenty-three months confinement and three consecutive years of probation. She remains incarcerated.

Trial Court Opinion, 6/19/15, at 1-3.

On March 30, 2015, DHS filed petitions to involuntarily terminate Mother's parental rights to the Children, as well as petitions to change the Children's permanency goals to adoption. A termination and goal change hearing was held on April 14, 2015. Following the hearing, the trial court entered decrees terminating Mother's parental rights and orders changing the Children's permanency goals. Mother timely filed notices of appeal on May 13, 2015, along with concise statements of errors complained of on appeal.[2]

On appeal, Mother raises the following issues for our review.

> 1. Did [DHS] sustain the burden that [M]other's rights should be terminated when there was evidence that [M]other had been actively working towards completing her permanency goals?
>
> 2. Was there [] sufficient evidence presented to establish that it was in the best interest of the [C]hildren to terminate [M]other's parental rights?

---

[2] Mother filed one notice of appeal and concise statement of errors complained of on appeal per child, each of which included the docket numbers for both the change of goal and termination matters. We note that it was improper for Mother to file a single notice of appeal as to each child, rather than filing a notice of appeal as to each termination decree and goal change order. **See** Pa.R.A.P. 341, Note ("[w]here, however, one or more orders resolves issues arising on more than one docket or relating to more than one judgment, separate notices of appeal must be filed."). However, as there is no dispute Mother's notices of appeal were timely filed, we decline to quash Mother's appeal. **See id.** at 902 (stating, "[f]ailure of an appellant to take any step other than the timely filing of a notice of appeal does not affect the validity of the appeal[]").

Mother's Brief at 4.[3]

We consider Mother's claims mindful of our well-settled standard of review.

> The standard of review in termination of parental rights cases requires appellate courts to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. A decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. The trial court's decision, however, should not be reversed merely because the record would support a different result. We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings.

*In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013) (citations and quotation marks omitted).

Termination of parental rights is governed by Section 2511 of the Adoption Act, 23 Pa.C.S.A. §§ 2101-2938, which requires a bifurcated analysis.

---

[3] While Mother purports to appeal from the orders changing the Children's permanency goals to adoption, her brief on appeal contains no substantive discussion of any issue pertaining to these orders. Accordingly, Mother has failed to preserve any challenge to the goal change orders for our review, and we address only the decrees terminating Mother's parental rights. *See In re W.H.*, 25 A.3d 330, 339 n.3 (Pa. Super. 2011) (stating, "[w]here an appellate brief fails to provide any discussion of a claim with citation to relevant authority or fails to develop the issue in any other meaningful fashion capable of review, that claim is waived[]"), *appeal denied*, 24 A.3d 364 (Pa. 2011), *quoting In re A.C.*, 991 A.2d 884, 897 (Pa. Super. 2010).

Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

*In re L.M.*, 923 A.2d 505, 511 (Pa. Super. 2007) (citations omitted).

In this case, the trial court terminated Mother's parental rights pursuant to Sections 2511(a)(1) (2), (5), (8), and (b). We need only agree with the trial court as to any one subsection of Section 2511(a), as well as Section 2511(b), in order to affirm. *In re B.L.W.*, 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*), *appeal denied*, 863 A.2d 1141 (Pa. 2004). Here, we analyze the court's decision to terminate under Sections 2511(a)(2) and (b), which provide as follows.

**§ 2511. Grounds for involuntary termination**

**(a) General rule.--**The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

…

(2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary

- 8 -

for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

…

**(b) Other considerations.--**The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child.  The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent.  With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A. § 2511(a)(2), (b).

We first address whether the trial court abused its discretion by terminating Mother's parental rights pursuant to Section 2511(a)(2).  "The grounds for termination due to parental incapacity that cannot be remedied are not limited to affirmative misconduct.  To the contrary, those grounds may include acts of refusal as well as incapacity to perform parental duties." *In re A.L.D.*, 797 A.2d 326, 337 (Pa. Super. 2002) (citations omitted).  "[A] parent's incarceration is relevant to the section (a)(2) analysis and, depending on the circumstances of the case, it may be dispositive of a parent's ability to provide the 'essential parental care, control or subsistence'

that the section contemplates." ***In re A.D.***, 93 A.3d 888, 897 (Pa. Super. 2014), *quoting* 23 Pa.C.S.A. § 2511(a)(2).

Instantly, the trial court found that Mother's repeated and continued incapacity, abuse, neglect, or refusal has caused the Children to be without essential parental care, control, or subsistence necessary for their physical or mental well-being, and that the conditions and causes of Mother's incapacity, abuse, neglect, or refusal cannot, or will not, be remedied. Trial Court Opinion, 6/19/15, at 5, 7. The trial court emphasized Mother's failure to comply with her FSP objectives, her frequent incarcerations, and her failure to maintain contact with the Children while incarcerated. ***Id.*** at 4-5, 7. Mother argues that the trial court abused its discretion by terminating her parental rights, because she had been making progress with respect to her FSP objectives prior to being incarcerated in October 2014. Mother's Brief at 15-16, 18-19. Mother asserts that when she was not incarcerated she was consistently visiting the Children. ***Id.*** at 15.

After a thorough review of the record in this matter, we conclude that the trial court did not abuse its discretion by involuntarily terminating Mother's parental rights to the Children. During the termination and goal change hearing, DHS presented the testimony of Community Umbrella Agency case manager, Tolani Matthews. Ms. Matthews testified that she has been assigned to this matter since July 2014. N.T., 4/14/15, at 3-4. Mother was incarcerated at the time Ms. Matthews was assigned to the case, but

- 10 -

she was released later that month.  *Id.* at 7.  Mother called Ms. Matthews shortly after being released, and Ms. Matthews was able to meet with Mother and discuss her FSP objectives.  *Id.* at 7-8.  Ms. Matthews explained that Mother's objectives included visiting with the Children, complying with her probation, and attending ARC for "housing, employment, anger management and also to have her dual diagnosis screen that was [c]ourt ordered, and the CEU referral that was [c]ourt order[ed]." *Id.* at 8.

Ms. Matthews further testified that Mother was incarcerated for a second time in October 2014.  *Id.* at 7-8.  Prior to her second period of incarceration, Mother attended ARC "for her classes and her anger management but it was inconsistent."  *Id.* at 10.  Specifically, Mother attended two of four housing classes, and three of five anger management classes.  *Id.* at 25.  Mother failed to appear for the initial intake with respect to her employment classes, and she did not complete a drug and alcohol or dual diagnosis assessment.  *Id.* at 10, 15, 25.  Mother did, however, consistently attend her biweekly visits with the Children during this time. *Id.* at 10-11, 13.

Ms. Matthews explained that Mother was released from her second period of incarceration in January 2015.  *Id.* at 10.  Mother called shortly after her release to request visits with the Children.  *Id.* at 14.  As explained by Ms. Matthews, "we were playing phone tag, and then the numbers I had for her were no longer working." *Id.*  Mother was incarcerated a third time

in February 2015. *Id.* at 26, 28. Mother has never provided Ms. Matthews with information indicating that she completed any programs while incarcerated. *Id.* at 15. To the knowledge of Ms. Matthews, Mother has never sent cards or letters to the Children while incarcerated. *Id.* at 22. However, Mother made an unknown number of phone calls to P.J.W.P.'s foster mother and spoke with P.J.W.P. *Id.* at 20-21.

Mother testified that she attempted to complete her FSP objectives prior to being incarcerated in October 2014. *Id.* at 31. Mother stated that she was attending anger management classes and that she interviewed for various retail jobs. *Id.* at 32. Concerning her lack of housing, Mother explained that she briefly stayed at a shelter, but that her probation officer told her that she had to leave. *Id.* at 31. Mother also indicated that she completed a "FIR" evaluation in October 2014.[4] *Id.* Mother anticipated that she would be released from incarceration once "FIR" was able to locate a suitable drug and alcohol program for her, which could take "up to 3 to 8 weeks …." *Id.* at 38.

Accordingly, the record supports the conclusion of the trial court that Mother is incapable of providing the Children with essential parental care, control, or subsistence necessary for the Children's physical or mental well-being. Moreover, Mother cannot, or will not, remedy her parental incapacity.

---

[4] While not explained during the hearing, it appears that "FIR" refers to Philadelphia's Forensic Intensive Recovery program.

Since the Children were placed in foster care, Mother has been incarcerated three times. Mother remained incarcerated at the time of the termination and goal change hearing, and it was unclear when Mother would be released. Mother has failed to complete her FSP objectives, and she is nowhere near being able to care for either of the Children. In addition, Mother has made only a minimal effort to maintain a relationship with the Children during her periods of incarceration. It appears that Mother made no attempt to contact J.T.Q.-W. during this time. While Mother made an unknown number of phone calls to P.J.W.P., she did not send cards or letters to either child. Accordingly, Mother's first issue fails.

We next consider whether the trial court abused its discretion by terminating Mother's parental rights pursuant to Section 2511(b). We have discussed our analysis under Section 2511(b) as follows.

> Section 2511(b) focuses on whether termination of parental rights would best serve the developmental, physical, and emotional needs and welfare of the child. As this Court has explained, Section 2511(b) does not explicitly require a bonding analysis and the term 'bond' is not defined in the Adoption Act. Case law, however, provides that analysis of the emotional bond, if any, between parent and child is a factor to be considered as part of our analysis. While a parent's emotional bond with his or her child is a major aspect of the subsection 2511(b) best-interest analysis, it is nonetheless only one of many factors to be considered by the court when determining what is in the best interest of the child.
>
> > [I]n addition to a bond examination, the trial court can equally emphasize the safety needs of the child, and should also consider the

- 13 -

> intangibles, such as the love, comfort, security, and stability the child might have with the foster parent. Additionally, this Court stated that the trial court should consider the importance of continuity of relationships and whether any existing parent-child bond can be severed without detrimental effects on the child.

*In re Adoption of C.D.R.*, 111 A.3d 1212, 1219 (Pa. Super. 2015), *quoting*

*In re N.A.M.*, 33 A.3d 95, 103 (Pa. Super. 2011) (quotation marks and citations omitted).

Here, the trial court determined that it would best serve the needs and welfare of the Children to terminate Mother's parental rights. Trial Court Opinion, 6/19/15, at 7. The trial court found that the Children have no parent/child bond with Mother. *Id.* at 6. The trial court also emphasized the Children's bond with their respective foster parents and found that it would be harmful to the Children to be removed from their current placements. *Id.* Mother argues that the testimony of Ms. Matthews was inadequate to establish that there is no bond between Mother and the Children and that the Children will not be harmed by terminating her parental rights. Mother's Brief at 21. Mother notes that Ms. Matthews only observed Mother interact with the Children on a few occasions and that the trial court did not have the benefit of a bonding evaluation. *Id.*

We again discern no abuse of discretion. Ms. Matthews testified that she attended Mother's visits with the Children prior to her second incarceration in October 2014. N.T., 4/14/15, at 11. With respect to

P.J.W.P., Ms. Matthews observed that she displayed "no attachment" to Mother during the visits. *Id.* at 12. With respect to J.T.Q.-W., Ms. Matthews stated, "it was more as if like, a[n] aunt or a sibling, like, he knew who she was, but it wasn't a mother and son relationship." *Id.* In contrast, Ms. Matthews explained that P.J.W.P. has a strong bond with her foster mother and that she refers to her as "mom."[5] *Id.* at 17. Similarly, J.T.Q.-W. has a strong bond with his foster father, and refers to his foster father as "dad." *Id.* at 20. Ms. Matthews opined that neither child would be harmed if Mother's parental rights were terminated, but that both of the Children would suffer harm if they were removed from their current pre-adoptive placements. *Id.* at 16-20.

Mother testified that the Children were excited to see her during their visits and that the Children love her and miss her. *Id.* at 33-38. Mother insisted that the Children are bonded with her and that the Children would be harmed if they were no longer able to see her. *Id.* at 35-37. Mother reported that she talks to P.J.W.P. on the phone and that "every time I talk to her" P.J.W.P. asks Mother to "come over to my house, and come get me …." *Id.* at 37.

Upon review, we conclude the record supports the trial court's finding that it would best serve the Children's needs and welfare to terminate

---

[5] As noted in the trial court's summary of facts, P.J.W.P.'s foster mother is her paternal grandmother, "Ms. [P.]" Trial Court Opinion, 6/19/15, at 3.

Mother's parental rights. At the time of the termination and goal change hearing, the Children had been in foster care for over a year and a half. The Children are bonded with their respective foster parents, and it is clear that Mother will not be able to resume performing parental duties for the Children at any time in the foreseeable future. In addition, the court was free to accept the testimony of Ms. Matthews that the Children do not have a parent/child bond with Mother and that the Children would not be harmed if Mother's parental rights were terminated. While Mother emphasizes that the trial court did not have the benefit of a bonding evaluation, it is well-settled that courts in termination proceedings are "not required by statute or precedent to order a formal bonding evaluation be performed by an expert." *In re K.K.R.-S.*, 958 A.2d 529, 534 (Pa. Super. 2008) (citation omitted). Further, while Mother notes that Ms. Matthews observed her interactions with the Children on only a few occasions, it was Mother's frequent incarcerations that prevented Ms. Matthews from observing Mother with the Children more often. To the extent the Children retain some attachment to Mother, it is clear that this attachment is outweighed by Mother's parental incapacity and by the Children's need for permanence and stability. *See* *C.D.R.*, *supra* at 1220 (concluding that the appellant mother's bond with C.D.R was outweighed by the mother's "repeated failure to remedy her parental incapacity" and by C.D.R.'s need for permanence and stability).

Based on the foregoing, we conclude that the trial court did not abuse its discretion by involuntarily terminating Mother's parental rights. ***See T.S.M.***, ***supra***. In addition, we conclude that Mother has waived any challenge to the orders changing the Children's permanency goals to adoption. Accordingly, the trial court's April 14, 2015 orders and decrees are affirmed.

Decrees affirmed. Orders affirmed.

Judgment Entered.

_____
Joseph D. Seletyn, Esq.
Prothonotary


Date: 3/15/2016